## A10A1197. RESOURCE LIFE INSURANCE COMPANY v. BUCKNER et al.

(698 SE2d 19)

BLACKBURN, Judge.

In this class action, the putative class members are all those individuals who purchased credit life or credit disability insurance[1] from Resource Life Insurance Company and who may be owed a refund from Resource Life for unearned premiums on those policies.[2] The underlying issue in the case is whether Resource Life's failure to refund unearned premiums constituted a breach of the insurance contract and/or constituted a negligent or wilful breach of a legal duty owed its insureds. Following a class discovery period that exceeded five years and involved numerous discovery disputes, Resource Life now appeals from several orders of the trial court, asserting that the trial court erred: (1) in denying Resource Life's motion for partial summary judgment; (2) in holding both that written notice was not a condition precedent to its obligation to refund unearned premiums and that, alternatively, the filing of this lawsuit satisfied the written notice provision in the Resource Life policies as to all putative class members; (3) in certifying two nationwide classes; (4) in sanctioning Resource Life for failing to comply with discovery orders and for giving false responses to discovery requests; (5) in failing to exercise independent judgment in entering certain orders; (6) in striking certain affidavits that Resource Life filed in opposition to the class certification motion; and (7) in ruling that certain documents were not privileged and were therefore discoverable. Discerning no error, we affirm.

### The Resource Life Policies

The record shows that Resource Life credit insurance policies were sold by automobile dealers, who acted as Resource Life's agents.[3] The term of any given policy was synonymous with the term of the loan it covered — i.e., the insurance is in effect only so long as money remains due on the loan. Premiums are calculated based on the length of the loan. Rather than being paid on a quarterly, semi-annual or annual basis, however, these premiums were paid in their entirety, at the time the insured obtained his or her car loan.

In the event a loan terminated "early" (i.e., before the end of the

---

[1] A credit life insurance policy pays the insured's car loan in the event of the insured's death; a credit disability policy makes an insured's payments on such a loan during the time the insured is totally disabled.

[2] Excluded from the class are those individuals whose claims would be barred by the applicable statute of limitation.

[3] The dealer-agents generally retained approximately 40 percent of the premium as compensation for their marketing and selling of the insurance.

installment period specified in the loan agreement), the insured was, as a matter of law, entitled to a refund of the unearned premiums. See OCGA § 33-31-5. Resource Life's internal marketing and training documents evidenced the company's understanding of this legal obligation. Specifically, the "Resource Life Credit Insurance Guide," which was apparently provided to the automobile dealers that acted as Resource Life agents, stated:

> In the event an account is prepaid, a timely refund *must* be made. Under this circumstance, refunds are to be made without the Insured's written request. Notification of such pre-payment can be made directly by the lender or by reference to a debit on the reserve account statement.

(Emphasis in original.) With respect to "Cancellation Procedures," this Guide provided:

> TERMINATION: Credit insurance is considered terminated when either the customer requests cancellation of the coverage or the loan is paid in full or refinanced for any reason before maturity. When Credit Insurance is terminated, a refund of unearned premium becomes due. **It is the responsibility of the Group Policyholder/Agent to promptly compute and refund the unearned premium and prepare the necessary paperwork to notify the Insurance Company.** *FAILURE TO REFUND PREMIUM WHEN REQUIRED IS A VIOLATION OF INSURANCE LAW.*
>
> NOTICE OF CANCELLATION AND DISTRIBUTION OF REFUNDS:
>
> *Written notice by the Insured is not required* to effect the cancellation when the indebtedness is paid in full or refinanced prior to the scheduled expiry date.

(Emphasis in original.)

Despite its legal obligation to refund unearned premiums, however, the Resource Life policies made such refunds contingent on its receipt of written notice, either by or on behalf of the insured, that the insured was owed such a refund. Specifically, the policies provided, in relevant part:

> Refunds: If the insurance stops before the end of the Term of Insurance, We will on written notice refund any unearned

YALE LAW LIBRARY

premium. We will pay it to the Creditor to reduce or pay off the Debt. Any remainder will be paid to You. . . . Refunds will be computed as of the date the insurance stops.

## The Complaint

In early 2001, Dorothy Buckner purchased a car and financed that purchase with a loan. As part of that transaction, Buckner bought both a credit life and a credit disability insurance policy from Resource Life. In November 2001, Buckner's automobile was totaled and her debt on the same was extinguished, thereby triggering the automatic cancellation of the Resource Life policies. At that time, Resource Life owed Buckner a refund of her unearned premium in the amount of approximately $1,213.60. Based upon an alleged mathematical error by the automobile dealer who issued the refund on Resource Life's behalf, Buckner did not receive the entire amount she was owed.

On January 23, 2004, Buckner filed the current action individually and on behalf of a class of all persons who purchased credit insurance from Resource Life in the preceding six years. The complaint alleged that Resource Life possessed enough information about each of its individual insureds to be able to determine whether and when any of their insurance policies had been automatically cancelled because of an early termination of the insured's loan prior to its maturity date; that despite this ability, Resource Life made no effort to determine when unearned premiums were owed and to repay the same; and that, as a result, Resource Life had breached its insurance contracts, breached legal duties owed its insureds, and unjustly enriched itself. Buckner asserted claims for breach of contract, unjust enrichment, negligence, and wilful, wanton, and intentional misconduct, and sought compensatory and punitive damages, injunctive relief, and attorney fees.

## Resource Life's Motion for Partial Summary Judgment

On July 20, 2007, in the midst of the parties' ongoing discovery disputes, Resource Life filed a motion for partial summary judgment. The company sought a ruling that (i) in light of the "written notice" language in its insurance certificates, it was not obligated to refund any unearned premiums unless and until it received written notice of an insured's early loan termination; and (ii) none of the putative class members could assert a claim against Resource Life unless and until they provided the company with such written notice. The trial court summarily denied that motion by order dated May 13, 2008.

## Class Certification

On June 3, 2009, Buckner filed a motion for certification of two

YALE LAW LIBRARY

classes under OCGA § 9-11-23. Specifically, Buckner sought certification of a class under OCGA § 9-11-23 (b) (3), whose members would consist of Resource Life insureds whose loans had terminated early and who would therefore be entitled to actual damages in the amount of unearned premiums owed them, together with statutory interest. She also sought certification of a class under OCGA § 9-11-23 (b) (2), whose members would consist of current and future Resource Life insureds whose policies had not yet terminated, but who would be entitled to injunctive relief.

In support of its opposition to that motion, Resource Life filed four affidavits from individuals who stated that they either worked or had worked in the finance and insurance departments of various automobile dealerships that sold Resource Life policies. Each of these individuals averred that, at the time they sold customers Resource Life credit policies, they explained to the customers that "written notice of the cancellation of their credit insurance needed to be provided in order for them to obtain a refund" of any unearned premium. Buckner moved to strike these affidavits on the grounds that they contained inadmissible parol evidence and were irrelevant. The trial court agreed, and granted the motion to strike.

Following an evidentiary hearing, the trial court granted the motion for class certification. Pursuant to OCGA § 9-11-23 (b) (2), the trial court certified a class consisting of all residents of the United States who are current or former certificate holders of Resource Life's single-premium credit life and/or disability insurance.[4] The trial court certified a second class pursuant to OCGA § 9-11-23 (b) (3), consisting of all residents of the United States who held certificates of Resource Life's single-premium credit life and/or disability insurance between January 23, 1998 and the present and whose underlying debt terminated "before coverage expired but who have not received a full refund of [their] unearned premiums."[5]

### Discovery Disputes

(i) *Data on Resource Life insureds*. At the time Buckner filed her complaint, she also served class discovery requests on Resource Life. Those requests asked Resource Life, inter alia, to provide 11 items of data with respect to each of its insureds who represented potential class members. The purpose of this request was to allow Buckner to obtain information that she could then utilize (by providing the same

---

[4] Excluded from this class are, inter alia, certificate owners whose policies expired without early termination, whose policies were rescinded by mutual agreement, or whose certificates stopped outside the applicable limitation period.

[5] Excluded from this class were, inter alia, owners whose policies were rescinded by mutual agreement or whose debt stopped outside the applicable limitation period.

to information services providers or credit reporting agencies) to determine whether putative class members were entitled to a refund of their unearned premiums. After Resource Life objected to this request, Buckner filed a motion to compel. Following a hearing on that motion in September 2006, the trial court entered an order requiring Resource Life to produce the following data for all potential class members: (i) the insured's name, address, date of birth, and social security number; (ii) the insured's insurance certificate (policy) number, the policy's inception and expiration dates, and the premium amount paid; (iii) the amount of any unearned premium refunded or credited to the insured and the date of such refund or credit; and (iv) the name and address of the insured's lender or creditor. In its order, the trial court found that this data represented information that Resource Life

> was obligated to obtain and maintain . . . in the ordinary course of its business to perform its statutory and contractual duties to refund unearned premiums upon early termination of insured loans, and that [Resource Life] should have that information available in a readily accessible format within its records.

The order gave Resource Life 60 days to supply the information; when the company failed to meet that deadline, Buckner filed a motion for sanctions, which the trial court eventually referred to a special master.

(ii) *Loan Termination Dates.* In late 2006, Buckner served her second set of continuing interrogatories on Resource Life. Interrogatory number 8 asked for the loan termination dates ("LTDs") for any credit insurance policies purchased between January 23, 1998 and January 23, 2004. Resource Life responded in January 2007 that "it ha[d] not received written notice of [LTDs] for any [such policies]." Notably, Resource Life did not state that it had responsive documents that were subject to a privilege. Moreover, Resource Life continued to assert, throughout the course of the litigation, that it could not obtain LTDs from lenders or anyone else, including the automobile dealers who acted as its agents.

At a hearing held in August 2008, Buckner learned for the first time that in early 2005 Resource Life had obtained from lenders at least 82 LTDs. Resource Life claimed, however, that such information was obtained as part of an internal investigation, supervised by in-house counsel and conducted for the purpose of evaluating a settlement offer. Thus, the company asserted that this information was subject to the work-product privilege.

Sometime in 2009, Buckner learned that in July 2008 the Texas

Attorney General had provided Resource Life with several thousand LTDs that his office had obtained from lenders.[6] Resource Life, however, failed to amend its discovery responses to disclose these LTDs. Indeed, even after it received these LTDs, the company continued to represent to the court below that it had no LTDs and could not obtain the same from third parties.

Buckner filed a motion to compel production of the 82 LTDs that Resource Life claimed constituted privileged work product. It also moved for sanctions against Resource Life based on both its failure to disclose these LTDs in its initial discovery responses and its failure to supplement its responses to disclose the LTDs provided to the company by Texas authorities, as well as its failure to comply with the trial court's order that it produce certain data for all of its insureds. The trial court also referred these motions to a special master.

### Ruling on Privilege

In addition to the 82 LTDs that it obtained in 2005, Resource Life also claimed privilege as to a number of other documents. The company requested, however, that the trial court not conduct an in camera review of the allegedly privileged documents, because it feared that such a review might "influence the [c]ourt's consideration of other matters pending before [it]." Instead, it asked that the trial court refer the question of privilege to a special master, and the trial court granted that request.

Following an in camera review of the allegedly privileged documents and an evidentiary hearing, the special master found that while some of the documents were privileged others, including the 82 LTDs Resource Life obtained from third parties in 2005, were not. It divided the documents into two categories (discoverable and nondiscoverable) and ordered them filed under seal, given that Resource Life had announced its intention to appeal the special master's finding that some of the documents were not privileged and therefore discoverable. Resource Life thereafter filed exceptions to the recommendations of the special master that found certain documents to be discoverable.

The trial court entered an order adopting the recommendations of the special master, noting that because Resource Life had not withdrawn its request that the trial court refrain from conducting an in camera review of the documents, it had no choice but to rely solely on the special master's review of the same.

---

[6] The Texas Attorney General had apparently obtained this information in conjunction with an action similar to the current one, filed against Resource Life in Texas.

## Sanctions

Following an evidentiary hearing, the special master recommended the entry of sanctions against Resource Life for its discovery abuses, and made extensive factual findings in support of that recommendation. Resource Life filed exceptions to the special master's findings and the trial court thereafter held an evidentiary hearing on the sanctions motion. On October 29, 2009, the trial court entered an order granting the motion. The trial court noted that, despite the lapse of over two years since the entry of its order requiring Resource Life to produce certain items of data with respect to its insureds, the company had yet to comply with that order. Instead, Resource Life had provided complete data for only four percent of its insureds. The lower court further found that Resource Life "could have complied with the [discovery] order if it [had] faithfully attempted to do so. [Its] failure to comply with the . . . Order was not accidental or unavoidable, it was either willful or the result of a conscious indifference to the consequences." Additionally, the trial court noted that Resource Life's delay in producing this information had "seriously prejudiced [Buckner's] ability to obtain LTDs for some class members," because without data such as social security numbers, she could not run credit reports on potential class members to determine early loan payoffs and "[i]t is undisputed that credit reporting agencies dispose of their data."

With respect to the LTDs, the trial court found that they were "integral pieces of information relevant to establishing class certification" and that they were "arguably the most important pieces of evidence in this case." Based on the evidence, the court concluded that Resource Life had deliberately misled the court and Buckner as to whether it had any LTDs and whether it could obtain LTDs from third parties and that it did so because

> [a]bsent concealment of its acquisition and possession of the LTDs, [Resource Life] could not have plausibly argued (as it has done repeatedly) that it could not obtain LTDs, and that argument was central to [Resource Life's] opposition to [the] pending motion for class certification.

The trial court further noted that

> [a]lthough the LTDs [Resource Life] obtained in 2005 were relatively few in number, the fact that [Resource Life] had them, could obtain them, and could obtain them from the insured's lenders — which was one of the methodologies [that Buckner] argued made a class action manageable — was crucial evidence.

In light of these discovery abuses, the trial court sanctioned Resource Life by ruling that all "non-refunded insureds" (i.e., those members of the class whom Resource Life's records show did not receive an unearned premium refund) "shall be presumed to have terminated early" and be owed such a refund. Resource Life was given the opportunity to rebut this presumption by producing proof, within 120 days of the trial court's sanctions order, that an insured's loan did or did not terminate early. With respect to those insureds for whom Resource Life was unable to find proof of a LTD, the presumption would be that they were owed a refund of $491.75, which Resource Life had "state[d] is the average refund paid to insureds whose loans terminated early."[7]

Resource Life now appeals from the orders of the trial court denying its motion for partial summary judgment, granting class certification, imposing sanctions against it, striking the affidavits it submitted in support of its opposition to class certification, and affirming the Special Master's finding that certain documents were not protected from discovery by the work-product privilege.

1. Resource Life first argues that the trial court erred in denying its motion for partial summary judgment. On appeal from a denial of summary judgment where, as here, the facts are undisputed, we conduct a de novo review of the evidence to determine whether the facts, viewed in the light most favorable to the nonmoving party, entitle the movant to judgment as a matter of law. See *Ga. Messenger Svc. v. Bradley*.[8] Additionally, "[t]he construction of an insurance contract, including the issue of whether a contract is ambiguous, is a question of law for the court." *Rentrite, Inc. v. Sentry Select Ins. Co.*[9]

Resource Life sought summary judgment on the issue of written notice — i.e., it sought a ruling that, in light of the "written notice" language in its insurance certificates: (i) it was not obligated to refund any unearned premiums unless and until it received written notice of an insured's early loan termination; and (ii) such written notice constituted a condition precedent to any class member's assertion of a claim against Resource Life for a refund of their unearned premium. Neither the language of the Resource Life policies nor the applicable law, however, supports the conclusion that written notice constitutes a condition precedent to the insurer's obligation to refund unearned premiums.

As a general rule, a notice provision in an insurance policy is not

---

[7] With respect to those insureds for whom Resource Life could demonstrate an actual LTD, those whose loans did not terminate early would be excluded from the class; those whose loans did terminate early would be given a refund based on the actual LTD.

[8] *Ga. Messenger Svc. v. Bradley*, 302 Ga. App. 247, 247 (690 SE2d 888) (2010).

[9] *Rentrite, Inc. v. Sentry Select Ins. Co.*, 293 Ga. App. 643, 644 (667 SE2d 888) (2008).

considered a condition precedent unless it expressly states that a failure to provide such notice will result in a forfeiture of the insured's rights or "uses language which otherwise clearly expresses the intention that the [notice] provision be treated as a condition precedent." 13 Couch on Insurance, § 186:42 (3d ed. 2005). See also *Parris v. Great Central Ins. Co.*[10] This rule reflects "the desire of the law to avoid forfeitures" of an insured's rights. Couch, supra, § 186:42. Thus under Georgia law, policy language such as that at issue, which does nothing more than require the insured to give notice of a particular event, is insufficient to create a condition precedent. *Canal Ins. Co. v. Savannah Bank & Trust Co.*;[11] *Parris*, supra, 148 Ga. App. at 278 (1).

The Resource Life policies

> contain[ed] no express stipulation to the effect that failure to [provide notice] will result in forfeiture [of the insured's right to a refund]. Nor was there an express stipulation in the polic[ies] that furnishing [such notice] shall be a condition precedent to the bringing of an action against the insurer.

*Parris*, supra, 148 Ga. App. at 278 (1). Under these circumstances, the filing of the class action itself was sufficient to provide Resource Life with the requisite notice as to the claims of the putative class members. *J. M. I. C. Life Ins. Co. v. Toole.*[12] See *American Pipe &c. Co. v. Utah*[13] (holding that the initiation of a class action puts the defendants on notice of the claims against them). "[G]iven the purpose to be served by ... the notice requirement of OCGA § 33-31-9 (c),[14] it does not matter whether the ... notice is first provided in the complaint." *SunTrust Bank v. Hightower.*[15]

Moreover, Resource Life's written notice argument potentially violates both Georgia law and public policy. OCGA § 33-31-5 obligates a credit insurer such as Resource Life to refund any unearned premiums. That statute provides, in relevant part, that "[i]n all

---

[10] *Parris v. Great Central Ins. Co.*, 148 Ga. App. 277, 278 (1) (251 SE2d 109) (1978).

[11] *Canal Ins. Co. v. Savannah Bank & Trust Co.*, 181 Ga. App. 520, 521 (2) (352 SE2d 835) (1987).

[12] *J. M. I. C. Life Ins. Co. v. Toole*, 280 Ga. App. 372, 374-375 (1) (b) (634 SE2d 123) (2006).

[13] *American Pipe &c. Co. v. Utah*, 414 U. S. 538, 553-554 (II) (94 SC 756, 38 LE2d 713) (1974).

[14] As discussed infra, OCGA § 33-31-9 (c) is the statute that requires credit insurers to refund unearned premiums. Effective May 1, 2005, the statute was amended to provide that "[i]t shall be the obligation of the insured to notify the insurer of the early payoff of the indebtedness which is covered by the insurance."

[15] *SunTrust Bank v. Hightower*, 291 Ga. App. 62, 67 (660 SE2d 745) (2008).

cases of termination prior to scheduled maturity [of the insured loan], a *refund shall be paid or credited* as provided in Code Section 33-31-9." (Emphasis supplied.) And, Georgia law holds that, so long as an insurer has knowledge that an unearned premium is owed, it may not avoid its obligation to refund that premium by requiring that an insured actually demand the same. *Genone v. Citizens Ins. Co. of N. J.*[16] (holding that the statement " '[a]ny return premium due under this policy, if not tendered [with the notice of cancellation], will be refunded upon demand,' . . . limit[ed] in no way the right of the insured or [the] obligation of the insurers as to return of the unearned premium").

Taken to its logical conclusion, Resource Life's notice argument is that regardless of its knowledge that it is holding unearned premiums, it is nevertheless free to retain those funds unless and until an insured provides the company with written notice of the fact that it is entitled to a refund. Such a rule would violate not only the foregoing legal principles, but would also be contrary to public policy, because it would allow an insurer to avoid the contractual obligations of good faith and fair dealing owed to its insureds. See *McGowan v. Progressive Preferred Ins. Co.*[17] (insureds "were entitled to expect that [their insurers] would exercise good faith in carrying out their obligations under their policies") (Barnes, J., concurring in part and dissenting in part); *Leader Nat. Ins. Co. v. Smith.*[18]

2. Resource Life also argues that the trial court erred by holding, in its class certification order, that written notice was not a condition precedent to its obligation to refund unearned premiums or, alternatively, that the filing of this lawsuit satisfied the written notice provision in the Resource Life policies as to all putative class members. In light of our holding in Division 1, supra, this claim of error is without merit.

3. Nor do we find any merit in Resource Life's argument that the trial court erred in certifying the two classes at issue.

Under Georgia law, a class may be certified where the trial court finds:

> (1) The class is so numerous that joinder of all members is impracticable; (2) There are questions of law or fact common to the class; (3) The claims or defenses of the representative parties are typical of the claims or defenses of the

---

[16] *Genone v. Citizens Ins. Co. of N. J.*, 207 Ga. 83, 91 (3) (60 SE2d 125) (1950).

[17] *McGowan v. Progressive Preferred Ins. Co.*, 274 Ga. App. 483, 496 (618 SE2d 139) (2005), rev'd on other grounds, *McGowan v. Progressive Preferred Ins. Co.*, 281 Ga. 169 (637 SE2d 27) (2006).

[18] *Leader Nat. Ins. Co. v. Smith*, 177 Ga. App. 267, 275 (1) (339 SE2d 321) (1985).

class; and (4) The representative parties will fairly and adequately protect the interests of the class.

OCGA § 9-11-23 (a).

Decisions regarding class certification fall within the trial court's discretion and will be upheld on appeal absent abuse of that discretion. Moreover, we will not reverse the factual findings in a trial court's class certification order unless they are clearly erroneous. Under the "clearly erroneous" test, factual findings must be affirmed if supported by any evidence.

*Village Auto Ins. Co. v. Rush.*[19] Implicit in this deferential standard of review is a recognition of the fact-intensive basis of the certification inquiry and of the trial court's inherent power to manage and control pending litigation.

(a) We first address the trial court's certification of a class under OCGA § 9-11-23 (b) (3), which consists of those insureds whose loans terminated early but who did not receive a refund of unearned premiums. Certification under this subsection is proper where the trial court finds that the proposed class meets the requirements of subsection (a) and that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." OCGA § 9-11-23 (b) (3).

"[C]laims arising from interpretation of form agreements are considered to be 'classic' cases for treatment as a class action." (Punctuation omitted.) *UNUM Life Ins. Co. of America v. Crutch-field.*[20] Thus, "Georgia case law provides that common questions of law and fact predominate when an action is brought on behalf of purchasers of agreements from a common source, the character of the right sought to be enforced is common, and common relief is sought." (Punctuation omitted.) Id. at 583. This is exactly the situation presented here. Each of the putative class members purchased an identical Resource Life credit insurance policy; each is owed a refund of unearned premium; and each is claiming that Resource Life breached its contractual and legal duties by failing to pay that refund. Despite this fact, however, Resource Life argues that the trial court erred in concluding that common questions of law

[19] *Village Auto Ins. Co. v. Rush*, 286 Ga. App. 688 (649 SE2d 862) (2007).

[20] *UNUM Life Ins. Co. of America v. Crutchfield*, 256 Ga. App. 582, 583 (568 SE2d 767) (2002).

and fact predominate.

First, Resource Life argues that common questions of law do not predominate over this nationwide class because there will be variations in state law as to: (i) whether state statutory or common law required the insured to give Resource Life written notice of his or her claim for an unearned premium; (ii) whether state law imposes a duty on insurers to "seek out" loan termination dates; (iii) whether state law requires the insurer or the lender to make the refund to the insured; and (iv) whether an insured's failure to provide notice in a timely fashion equitably estops them from seeking a refund. These arguments, however, are supported by neither the record nor applicable law.

With respect to the question of notice, the trial court concluded that even if state law required notice, the filing of the lawsuit satisfied that requirement. Resource Life has acknowledged that the written notice language at issue is standard, and is contained in all certificates of insurance it issued, in all but two states.[21] As discussed in Division 1, supra, under generally accepted rules of contract law, that language was insufficient to constitute a condition precedent. Moreover, Resource Life does not cite to any out-of-state court that has interpreted this specific language differently. Nor does Resource Life name even one state statute that makes written notice a condition precedent to an insurer's obligation to refund unearned premiums.

Similarly, the record shows that every state in which Resource Life sold insurance imposes an absolute legal obligation on credit insurers to refund unearned premiums. Notably, Resource Life's brief points to no state where that obligation could be shifted to a lender. And, given that the duty is contractual as well as statutory, we find persuasive the fact that all Resource Life policies provide that Resource Life, as the insurer, will refund any unearned premiums owed the insured.

Furthermore, assuming arguendo that the case presents a question of whether state law imposed an affirmative duty (an implied contractual duty or otherwise) on Resource Life to monitor loan termination dates, we cannot say that any variance among state laws (if it exists) would, standing alone, be sufficient to predominate over the common legal questions. Even if the answer to this question varied from state to state (and Resource Life has made no showing that it does), "the trial court nevertheless determined that common issues presented in this case predominate over these potential individual issues, and we cannot say that it abused its discretion in

---

[21] With respect to the remaining states, there was no notice language of any kind.

doing so." *Liberty Lending Svcs. v. Canada.*[22] See also *UNUM Life Ins. Co.*, supra, 256 Ga. App. at 584 (holding even though the case presented numerous individual issues of law, the trial court did not abuse its discretion in finding that the common legal issues predominated over the individual ones).

Finally, we find Resource Life's argument as to the applicability of equitable estoppel to be spurious. The company's own representative testified that it has never refused to return an unearned premium based on the timeliness of the request. The representative further testified that the company had never suffered any prejudice based on a delayed refund request, and we fail to see how an insurer could be prejudiced by refunding money it never earned. More importantly, we note the "well-recognized maxim that [one] who seeks equity must do equity." (Punctuation omitted.) *Southern Crescent Rehabilitation &c. v. Ga. Dept. of Community Health.*[23] We therefore cannot see how Resource Life can use equity as the basis for retaining unearned premiums — i.e., money that does not belong to it and that it can never earn.

In light of the foregoing, we find no legal variations that would bar class certification. See *Village Auto Ins. Co.*, supra, 286 Ga. App. at 690-691 (1) (common questions of law predominated where claims focused on "standard practices and documents, not on facts individual to each class member"); *UNUM Life Ins. Co.*, supra, 256 Ga. App. at 584.

Resource Life also alleges that the factual variations among the individual cases of the putative class members should bar class certification. Three of the five purported factual variations argued by Resource Life represent no more than a restatement of its arguments regarding written notice and estoppel, addressed above. The other alleged factual variations concern whether an insured's loan terminated early and, if so, whether the insured received a refund and the amount of that refund. None of these individual factual variations, however, is sufficient to preclude class certification. This is because they do not represent variations that would have any legal significance — i.e., they would not necessitate the application of a different set of legal principles. Rather, as the trial court found, "[w]hen the loan termination date is plugged in to the other information Resource Life admits it keeps for all insureds,[24] it is simply a formulaic administrative matter to determine both who is

---

[22] *Liberty Lending Svcs. v. Canada*, 293 Ga. App. 731, 740-741 (2) (668 SE2d 3) (2008).

[23] *Southern Crescent Rehabilitation &c. v. Ga. Dept. of Community Health*, 290 Ga. App. 863, 868 (3) (660 SE2d 792) (2008).

[24] This information includes the premium paid, the policy start date, and the policy expiration date.

owed a refund and how much each insured is owed." "[T]he fact that there may be differences in the damages for the members of the class does not prevent certification because, when common issues predominate, individualized damage calculations do not defeat class certification." (Punctuation omitted.) *UNUM Life Ins. Co.*, supra, 256 Ga. App. at 583. See *EarthLink, Inc. v. Eaves*[25] (class certification proper, despite factual differences in cases, where the class members "seek remedies which will be standard and formulaic across the class").

Finally, Resource Life argues that class certification under OCGA § 9-11-23 (b) (3) was improper because the class is not readily ascertainable. In support of this claim, Resource Life asserts that there is no reliable way to determine LTDs for the putative class members. The trial court rejected this argument, finding that the parties could use the data Resource Life admitted having as to its insureds to obtain the LTDs either from lenders or through credit reporting agencies. This conclusion is supported by the evidence of record showing that Resource Life obtained LTDs from lenders and that the Texas Attorney General was able to obtain thousands of such dates from credit reporting agencies. Moreover, this Court has previously held, in a class action involving similar circumstances, that credit-reporting data could be used to determine LTDs of the insureds. *Toole*, supra, 280 Ga. App. at 377 (2) (c). Moreover, at the evidentiary hearing below, Buckner established that when the class administrator in *Toole* employed such methods, it was able to determine LTDs for approximately 70 percent of the putative class members. Thus, because it is supported by some evidence, the trial court's finding that the class members could be ascertained in a manageable fashion must be affirmed. *Liberty Lending Svcs.*, supra, 293 Ga. App. at 740-741 (2). See also *EarthLink*, supra, 293 Ga. App. at 77 (1) ("[t]he [controlling] issue is not whether a class action will be difficult to manage. Instead, the trial court is to consider the relative advantages of a class action suit over other forms of litigation which might be available").

(b) We next address whether the trial court erred in certifying a class for injunctive and declaratory relief, pursuant to OCGA § 9-11-23 (b) (2). This class consists of all current and former owners of Resource Life credit insurance policies, excluding those whose policies expired without early loan termination.

OCGA § 9-11-23 (b) (2) allows for class certification if the four requirements of OCGA § 9-11-23 (a) have been met, and if "[t]he party opposing the class has acted or refused to act on grounds

---

[25] *EarthLink, Inc. v. Eaves*, 293 Ga. App. 75, 77 (1) (666 SE2d 420) (2008).

generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The trial court certified a (b) (2) class in this case after finding that Resource Life had a practice of remaining "deliberately ignorant" of early loan terminations, so as to avoid its legal and contractual obligations to refund unearned premiums. The court determined that "Resource Life's continued inaction [with respect to the refund of unearned premiums] establishes the need for a (b) (2) class and for declaratory and injunctive relief, absent which Resource Life will persist in its present scheme. . . ." The court further found that there were potential equitable remedies that would be common to the class, such as decrees requiring Resource Life to take certain actions to determine which of its former insureds were owed unearned premiums[26] and prospective injunctive relief directing Resource Life to establish practices that would allow it to promptly refund unearned premiums in the future.

In determining whether certification under OCGA § 9-11-23 (b) (2) is appropriate, a court should not focus "on the subjective intentions of the class representatives and their counsel in bringing suit" — i.e., it should not focus on whether the primary motive for the litigation was the recovery of monetary damages. *In re Monumental Life Ins. Co.*[27] Rather, the relevant questions are whether members of the proposed class would benefit from the injunctive relief sought and whether any monetary relief is incidental to the injunctive relief. Id. at 415-416 (III) (A). Here, Resource Life contends that certification of the (b) (2) class was improper because the predominant relief sought is monetary damages — i.e., the monetary relief is not incidental to the requested injunctive and declaratory relief. See *Rollins, Inc. v. Warren*[28] ("certification under Rule 23 (b) (2) is inappropriate if the predominate relief sought in the action is monetary damages"). We disagree.

The mere fact that putative (b) (2) class members seek monetary damages in addition to equitable relief does not automatically mean that those damages are the predominate relief sought. Rather, monetary relief is incidental to injunctive and declaratory relief where damages are "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Allison v. Citgo Petroleum Corp.*[29] See also *Monumental Life*, supra,

---

[26] For example, the trial court noted that it might require Resource Life to provide claims forms to insureds that had not received refunds.

[27] *In re Monumental Life Ins. Co.*, 365 F3d 408, 415 (III) (A) (5th Cir. 2004).

[28] *Rollins, Inc. v. Warren*, 288 Ga. App. 184, 192 (2) (653 SE2d 794) (2007).

[29] *Allison v. Citgo Petroleum Corp.*, 151 F3d 402, 415 (V) (B) (2) (5th Cir. 1998).

365 F3d at 416 (III) (A) (for money damages to be considered incidental, "[a]dditional hearings to resolve the disparate merits of each individual's case should be unnecessary") (punctuation omitted); *Rollins*, supra, 288 Ga. App. at 194 (2) ("monetary damages claims are not merely incidental when the damages claims of each individual class member would require detailed, case-by-case fact finding at mini-trials") (punctuation omitted).

At this stage in the litigation, it appears that the damages recoverable by the (b) (2) class members would be the refund of their unearned premiums and perhaps any interest owed thereon. As discussed supra, the calculation of such damages is merely a matter of plugging certain data into a predetermined, mathematical formula. In other words, individual damages hearings will be unnecessary. Given these facts, we cannot say that the trial court abused its discretion in granting certification of a (b) (2) class.

4. The trial court's entry of sanctions against Resource Life was based upon both the company's failure to comply with the August 2007 discovery order requiring it to produce certain data with respect to its insureds (OCGA § 9-11-37 (b) (2)) and its failure to produce the LTDs in its possession, in response to Buckner's interrogatories (OCGA § 9-11-37 (d)). Resource Life challenges the imposition of sanctions, arguing that (a) it did not violate the August 2007 discovery order or, alternatively, any such violation was not wilful; (b) it did not wilfully withhold LTDs; and (c) the sanctions imposed violated its due process rights.

"Trial judges have broad discretion in controlling discovery, including imposition of sanctions, and appellate courts will not reverse a trial court's decision on such matters unless there has been a clear abuse of discretion." (Punctuation omitted.) *Amaechi v. Somsino*.[30] This is because

> [t]rial judges, through their direct involvement with the case, the parties, and the attorneys, and their familiarity with the actions of the parties in the conduct of discovery in similar cases that are properly brought to their attention, are in the best position to evaluate the parties' conduct and to determine the appropriate level of sanctions.

*Gen. Motors Corp. v. Conkle*[31] (Blackburn, P. J., concurring specially). Wilfulness is not required for the imposition of sanctions; rather, "[t]he presence or absence of willfulness remains relevant in the

---

[30] *Amaechi v. Somsino*, 259 Ga. App. 346, 347 (577 SE2d 48) (2003).
[31] *Gen. Motors Corp. v. Conkle*, 226 Ga. App. 34, 48 (486 SE2d 180) (1997).

choice of sanction." (Punctuation omitted.) *Mayer v. Interstate Fire Ins. Co.*[32]

(a) Resource Life's claim that it did not violate the August 2007 discovery order is contravened by the record. As discussed earlier, that order grew out of Buckner's discovery request that Resource Life provide her with 11 specific items of data with respect to each of its insureds. The order specifically found that this data was "within the custody, possession, or control of Resource Life or its agents, employees, or assigns," such as the automobile dealers who acted as the company's agents. Resource Life has not appealed that order or the findings of fact contained therein and it is therefore bound by the same. See *3060 Corp. v. Crescent One Buckhead Plaza*[33] ("[m]atters not enumerated as error will not be considered on appeal") (punctuation omitted); *GCA Strategic Investment Fund v. Joseph Charles & Assoc.*[34] Because the requested data is in the custody, possession, or control of Resource Life or its agents, they were obligated to produce the same.

Although Resource Life's brief goes into great detail about its efforts to comply with the order, the fact remains that it has not done so, despite having in excess of six years to meet its obligation.[35] Indeed, as its brief implicitly acknowledges, Resource Life has produced all eleven items of data for only four percent of its insureds. Accordingly, the trial court did not err in finding that Resource Life had failed to comply with the August 2007 discovery order.

Additionally, the trial court's finding that Resource Life's failure to comply with the discovery order was "willful or the result of a conscious indifference to the consequences" is also supported by the record.

> Where a motion for sanctions is brought under OCGA § 9-11-37 (b) (2) for a party's failure to comply with an order compelling responses to discovery requests, *the existence or nonexistence of wilfulness should be considered not only in the context of the time period prescribed in the order compelling answers, but in the context of the entire period*

---

[32] *Mayer v. Interstate Fire Ins. Co.*, 243 Ga. 436, 437 (1) (254 SE2d 825) (1979).

[33] *3060 Corp. v. Crescent One Buckhead Plaza*, 300 Ga. App. 749, 752 (1) (686 SE2d 367) (2009).

[34] *GCA Strategic Investment Fund v. Joseph Charles & Assocs.*, 245 Ga. App. 460, 463 (1) (537 SE2d 677) (2000).

[35] We note that Resource Life's brief makes only "general" cites to the record with respect to its claimed efforts to comply with discovery requests. Court of Appeals Rule 25 (c) (2) (i), however, requires that "[e]ach enumerated error shall be supported in the brief *by specific reference to the record or transcript*. In the absence of such reference, the Court will not search for or consider such enumeration." (Emphasis supplied.)

*beginning with service of [the discovery requests] and ending with service of answers.* Events transpiring during this entire time period are probative of whether [the party sanctioned] acted with conscious indifference to the consequences of failure to comply with the order compelling answers.

(Punctuation omitted; emphasis supplied.) *City of Griffin v. Jackson.*[36]

The record shows that the discovery requests at issue were served in January 2004; that Buckner filed her motion to compel in November 2005; that the motion was argued in September 2006 and ultimately granted in August 2007, with Resource Life being given 60 days to comply; that Resource Life moved for an extension of time after the 60-day period had lapsed; and that Buckner thereafter moved for sanctions. At the hearing on the sanctions motion held in March 2008 (18 months after the entry of the order), the trial court gave Resource Life until May 1, 2008 to comply. As of the date of the sanctions order (October 29, 2009), Resource Life still had not provided all of the requested information.

Furthermore, there is evidence showing that Resource Life's failure to produce this information resulted not from its inability to do so, but from a lack of effort on its part. Although Resource Life's agents are contractually obligated to make their files available to the company for auditing purposes, there is no evidence that Resource Life undertook a comprehensive audit to obtain the necessary information. And, the efforts that the company did make to obtain that data appeared to be calculated to fail. Even though Resource Life had many of the 11 points of data in its files (such as the insured's name and the relevant policy information), it related none of this information to its agents to assist them in locating the missing data. Rather, over Buckner's objection, Resource Life asked its agents to supply all 11 items of data for every Resource Life policy they had sold, thereby greatly increasing the agents' work and, conversely, decreasing the odds of compliance. Also over Buckner's objection, Resource Life refused to compensate its agents for their efforts.

"In considering the entire protracted history of discovery and [Resource Life's] continued defiance of an explicit order, the trial court was plainly authorized to find" that the company's noncompliance was wilful. *Gazelah v. Rome Gen. Practice.*[37] See also *City of Griffin,* supra, 239 Ga. App. at 377 (1) ("[i]n determining whether a

---

[36] *City of Griffin v. Jackson,* 239 Ga. App. 374, 377 (1) (520 SE2d 510) (1999).

[37] *Gazelah v. Rome Gen. Practice,* 232 Ga. App. 343, 345 (4) (502 SE2d 251) (1998).

party has abused discovery, the trial court sits as trier of fact, and this Court will uphold a finding of wilful discovery abuse if there is any evidence to support it") (punctuation omitted).

(b) Resource Life makes several arguments in support of its claim that the trial court erred in finding it wilfully withheld LTDs. First, the company argues that the trial court erred in finding a wilful discovery violation based on its failure to produce the LTDs it obtained in 2005, because it asserted a claim of privilege as to these documents. What this argument fails to acknowledge, however, is that Resource Life did not assert that claim of privilege until more than three years after its initial response to the request. Resource Life had originally claimed that it had no responsive documents and that it could not obtain the same — representations that it made to the court on several occasions before acknowledging in 2008 that it possessed such documents and that it had obtained them from third parties. Moreover, Resource Life's argument on this issue also ignores its failure to supplement its discovery responses to provide Buckner with the LTDs the company received from the Texas Attorney General.

The trial court's order makes clear, therefore, that Resource Life was not sanctioned because of its claim of privilege; it was sanctioned because of its patently false discovery responses and its misrepresentations to the trial court. As this Court has previously observed:

> An interrogatory answer that falsely denies the existence of discoverable information is not exactly equivalent to no response. It is *worse* than no response. When there is no response to an interrogatory or the response is devoid of content, the party serving the interrogatory at least knows that it has not received an answer. It can move the court for an order to compel a response. . . . If the response is false, however, the party serving the interrogatory may never learn that it has not really received the answer to the interrogatory. The obstruction to the discovery process is much graver when a party denies having [the requested information] than when the party refuses to respond to an interrogatory asking if [such information is available].

(Punctuation omitted; emphasis in original.) *MARTA v. Doe*[38] (finding that a trial court could impose the same sanctions for false discovery responses as could be imposed for no responses).

Resource Life attempts to avoid the consequences of its miscon-

---

[38] *MARTA v. Doe*, 292 Ga. App. 532, 536 (1) (664 SE2d 893) (2008).

duct by arguing that its lawyers in this action engaged in no misconduct.[39] Specifically, counsel told the trial court of the 2005 LTDs shortly after the company informed them of the same. Similarly, counsel amended Resource Life's interrogatory responses to include the LTDs obtained from Texas shortly after the company gave counsel that information. The fact that Resource Life elected not to be forthcoming with its outside counsel, however, cannot save it — i.e., the false discovery responses were still the product of the company's deliberate conduct. "Failure to maintain contact and cooperate with counsel about the pending litigation so that discovery can be made is wilful misconduct." (Punctuation omitted.) *Thurman v. Unicure, Inc.*[40] And, "[a] litigant will not be heard to contend that its own conduct has removed it beyond the reach of sanctions, when it has frustrated the orderly process prescribed in OCGA § 9-11-37 by false or erroneous responses to interrogatories." (Punctuation omitted.) *MARTA*, supra, 292 Ga. App. at 537.

(c) "To comply with the Due Process Clause, a court must impose sanctions that are both 'just' and 'specifically related to the particular "claim" which was at issue in the order to provide discovery.' " *Serra Chevrolet v. Gen. Motors Corp.*,[41] citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée.*[42] Here, Resource Life first asserts that the sanctions were unjust, because its conduct was not wilful. In light of our holdings in Divisions 4 (a) and (b), supra, this argument is without merit.

Nor do we find any merit in Resource Life's argument that the sanction was unreasonable in light of the circumstances. As a threshold matter, this argument is premised on the erroneous factual assertion that the sanction resulted only from Resource Life's failure to produce the 2005 LTDs. The trial court's order makes clear, however, that the sanctions were based on Resource Life's wilful failure to comply with the August 2007 discovery order; its deliberately false responses to the interrogatory requests regarding LTDs, which included the failure to initially acknowledge the LTDs obtained from lenders in 2005 and to supplement its responses to include the LTDs provided to the company by the Texas Attorney General; and Resource Life's repeated misrepresentations to the

---

[39] The special master found that "there has been no showing . . . that Resource Life's lawyers knowingly filed false interrogatory answers [or] misled the trial court." We emphasize that the record supports this conclusion.

[40] *Thurman v. Unicure, Inc.*, 151 Ga. App. 880, 882 (2) (261 SE2d 785) (1979).

[41] *Serra Chevrolet v. Gen. Motors Corp.*, 446 F3d 1137, 1151 (III) (B) (11th Cir. 2006).

[42] *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée*, 456 U. S. 694, 707 (102 SC 2099, 72 LE2d 492) (1982).

court that it had no means of obtaining LTDs from third parties (an assertion that was directly contradicted by the fact that it had obtained LTDs from lenders).

Resource Life's argument on this issue is also premised on its claim that the sanction could amount to more than $400 million. This amount, however, assumes that there are no LTDs available for any of the 900,000 insureds that represent putative class members. As the record reflects, however, several thousand LTDs have already been determined and, as Resource Life's brief acknowledges, expert projections indicate that LTDs can be obtained for approximately 70 percent of the potential class members. In light of the foregoing, Resource Life has failed to show that the sanction imposed violated its due process rights.

5. Resource Life argues that the trial court abused its discretion by failing to exercise independent judgment, as evidenced by the fact that it entered proposed orders drafted by Buckner's counsel. This Court has previously held, however, that a trial court's adoption, verbatim, of a proposed order drafted by a party does not constitute an abuse of discretion. *Toole*, supra, 280 Ga. App. at 376 (2) (a). See also *Fuller v. Fuller*[43] ("[e]ven when a trial court adopts a proposed order verbatim, the findings of fact therein are those of the court and may be reversed only if they are clearly erroneous") (punctuation omitted). Accordingly, this claim of error is without merit.

6. Resource Life also asserts as error the trial court's order striking four of the affidavits it filed in opposition to Buckner's class certification motion. "A trial court retains broad discretion in determining whether to admit or exclude evidence, and . . . absent an abuse of discretion, we will not interfere with a trial court's determination as to the admission or exclusion of evidence on the grounds of relevancy." (Citation and punctuation omitted.) *Thornton v. Hemphill*.[44]

We agree with the trial court that whatever dealers or agents may have told insureds about the insurance policy is irrelevant to an interpretation of the same, particularly where, as here, no ambiguity appeared on the face of the contract. "Extrinsic evidence to explain ambiguity in a contract becomes admissible only when a contract remains ambiguous after the pertinent rules of construction have been applied." *Claussen v. Aetna Cas. &c. Co.*[45] See also *Rentrite, Inc.*, supra, 293 Ga. App. at 647 (1) ("[w]here the terms of an

[43] *Fuller v. Fuller*, 279 Ga. 805, 806 (1) (621 SE2d 419) (2005).
[44] *Thornton v. Hemphill*, 300 Ga. App. 647, 650 (2) (686 SE2d 263) (2009).
[45] *Claussen v. Aetna Cas. &c. Co.*, 259 Ga. 333, 334 (1) (380 SE2d 686) (1989).

insurance policy are plain and unambiguous, courts may not reduce or extend policy coverage by inference — i.e., by reading into the contract language that cannot be found therein").

Moreover, Resource Life's policy stated that "[n]o person has the right to waive, change or modify . . . this certificate of insurance." Given this language, therefore, nothing Resource Life's agents said could affect the terms of the contract.

7. In its final enumeration of error, Resource Life asserts that the trial court erred in holding that "certain privileged documents are discoverable." The company, however, fails to identify these documents either by generally describing the same in its briefs or by identifying them in the record.

Court of Appeals Rule 25 (c) (2) (i) requires that "[e]ach enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of such reference, the Court will not search for or consider such enumeration." "It is not the function of this Court to cull the record on behalf of a party in search of instances of error. The burden is upon the party alleging error to show it affirmatively in the record." (Punctuation omitted.) *Fleming v. Advanced Stores Co.*[46] "Thus, because [Resource Life] has failed to support [its] enumerations by a single citation to the record, [this claim of error] presents nothing for consideration." (Punctuation omitted.) *Fortson v. Brown.*[47]

For the reasons set forth above, we affirm the orders of the trial court denying Resource Life's motion for partial summary judgment, granting class certification, imposing sanctions against Resource Life, striking the affidavits it submitted in support of its opposition to class certification, and affirming the Special Master's finding that certain documents were not protected from discovery by the work-product privilege.

*Judgment affirmed. Barnes, P. J., and Bernes, J., concur.*

DECIDED JUNE 30, 2010 —

*Jones, Cork & Miller, Frank C. Jones, Cater C. Thompson, Buchanan & Land, Benjamin A. Land,* for appellant.

*Butler, Wooten & Fryhofer, James E. Butler, Jr., Joel O. Wooten, Jr., Brandon L. Peak, Oates & Courville, Samuel W. Oates, Jr., Hatcher, Stubbs, Land, Hollis & Rothschild, Gregory S. Ellington,*

---

[46] *Fleming v. Advanced Stores Co.*, 301 Ga. App. 734, 735 (688 SE2d 414) (2009).
[47] *Fortson v. Brown*, 302 Ga. App. 89, 90 (1) (690 SE2d 239) (2010).

*Bondurant, Mixson & Elmore, Michael B. Terry, Frank M. Lowrey IV*, for appellees.